U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

JUL 0 6 2005

ROBERT H. SHEMWELL, CLERK
BY _____
                DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

COLUMBUS SMITH, JR.                    DOCKET NO. 04-CV-1906

VERSUS                                 JUDGE DRELL

COMMISSIONER OF SOCIAL SECURITY        MAGISTRATE JUDGE KIRK

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

This case comes before the Court for a review of the final decision of the Commissioner of Social Security ("Commissioner"), denying Columbus Smith, Jr., Disability Insurance Benefits ("DIB") under the Social Security Act ("SSA"). 42 U.S.C. § 416(i), 423(d). The issue to be decided is whether substantial evidence in the record supports the finding of the Administrative Law Judge ("ALJ") that Smith is not disabled and thus not entitled to disability insurance benefits.

Smith was born in 1956 (Tr. 72), has a high school education (Tr. 219), and has past work experience as a welder. He filed an application for DIB on August 15, 2002, alleging a disability onset date of May 12, 2002, due to problems with both knees, problems with his left pelvic joint, degenerative disc disease, and stomach problems. (Tr. 52, 63.) Smith's claim was denied initially, and a request for hearing was timely made. A hearing was held on August 29, 2003, at which Smith, who was represented by counsel, appeared and testified. Harris Rowzie, a vocational expert (VE), also appeared and testified at the hearing. (Tr. 247-50.) The ALJ

issued a decision unfavorable to the claimant on March 24, 2004, and Smith filed a request for review with the Appeals Council. The Appeals Council denied review, and the decision of the ALJ became the final decision of the Commissioner.

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether the decision comports with relevant legal standards. McQueen v. Apfel, 168 F.3d 152, 157 (5th C. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable

mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, re-weigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But, to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988);

<u>Dellolio</u>, 705 F.2d at 125.

<u>Issues</u>

Smith raises the following issues for review:

(1)   Whether the ALJ erred in concluding that Smith did not
      equal the listing of impairments contained in Appendix 1,
      Subpart P, Regulation No. 4, Listing 1.02 and 1.03;

(2)   Whether the ALJ erred in failing to find that Smith's
      skin condition was a severe impairment in combination
      with Smith's other severe impairment, and in failing to
      address the skin condition under listing 8.02 and/or
      8.05; and

(3)   Whether the ALJ erred by giving more weight to the
      opinion of the evaluating physician rather than the
      treating physician.

<u>Factual Background</u>

Smith was forty-five years of age when he filed for DIB.  He
completed the twelfth grade and attended vocational school for
welding from August 1974 to May 1975.  (Tr. 69, 219.)  Smith worked
as a welder for the National Guard from 1977 until 2001, and worked
as a welder on offshore platforms and rigs, as well as land rigs,
for private companies from 1980 until 2002.  (Tr. 84, 221.)  Smith
claims that his physical problems involve both knees, bilateral
hips, lower back, skin lesions, and amputation of fingers on his
right hand.[1]   Smith argues that he has undergone radiographic,
diagnostic, and laboratory testing for his physical problems since
1984.

A report by orthopedic surgeon Christopher Cenac, M.D., dated

---

[1]Smith is right hand dominant.  (Tr. 239.)

4

April 25, 2001, notes that Smith sustained an injury to his right knee in 1984 while playing basketball. (Tr. 104.) Smith went on to perform manual labor for the next seventeen years. Dr. Cenac noted moderate to advanced degenerative disease of the right knee, ligament laxity, and muscle weakness on the right. (Tr. 104.) Dr. Cenac opined that Smith's prognosis was poor for continuing manual labor.

Smith injured his left knee in a work related accident on an offshore rig on May 12, 2002, the alleged onset date. (Tr. 15, 63, 114.) Smith reported to the VA Medical Center Orthopedic Clinic on August 5, 2002, complaining of increasing knee pain since 1984. (Tr. 107.) Smith reported no limitations on his ability to walk, but claimed that he had problems getting out of the car, getting up from a chair, and walking up stairs. (Tr. 107, 108.) He was placed on a home exercise program to improve endurance and mobility, and it was recommended that Smith be evaluated for knee replacement surgery. (Tr. 108.)

Smith reported to the VA hospital on January 10, 2002, with complaints of pain in his knees and hip. (Tr. 127.) Hospital records indicate Smith asked for cortisone for his left hip. In April 2002, Smith sought treatment for hip pain and a persistent rash and sores over his body. (Tr 129.) He was taking Amitriptyline HCL 25mg for sleep and pain[2], Flucinonide 0.05% cream

―――――――――

[2]Amitriptyline is an antidepressant.  www.medlineplus.gov

twice a day for skin problems, Hydrocodone 10 mg every six hours and Ibuprofen 600mg every eight hours for severe knee pain, and Rabeprazole 20mg, twice a day, for stomach acid. (Tr. 131.)

On April 30, 2002, Smith reported continued problems with his knee, especially while working. (Tr. 132.) The medical records indicate that a local physician recommended a patellectomy, but the VA doctor was not sure how that would help stabilize Smith's knee. The VA doctor stated that only an arthrodesis[3] would stabilize Smith's knee, "but I doubt he would consider that." (Tr. 132.) The VA doctor suggested that Smith get a second opinion. Smith also sought treatment at the VA on May 17 and 23, and June 3, 2002, for knee pain and inflammation. (Tr. 134-142.)

August 21, 2002, treatment notes from the kinesiotherapy department indicate that orthopedic services at VAMC Shreveport referred Smith for a home exercise program in preparation for possible knee surgery. (Tr. 144.) The kinesiotherapy consultation notes revealed severe wasting of quadriceps, lacking full extension. Smith was instructed to perform home exercises to increase the strength of those muscles. On that same date, a dermatology consultation note indicates that Smith has a chronic rash that was diagnosed as lichen simplex chronicus.[4]

---

[3]A joint fusion. www.medlineplus.gov

[4]Lichen simplex chronicus is a skin disorder characterized by chronic itching and scratching. The constant scratching causes thick, leathery, brownish skin. www.medlineplus.gov

6

Smith was evaluated by Dr. Robert Po on August 2, 2002. (Tr. 114.) Dr. Po noted a history of a work related knee injury on May 12, 2002, with swelling and infection. (Tr. 114.) Smith reported to Dr. Po that he underwent knee surgery in July 2002, and was seeking a second opinion because of continued pain and swelling. Additionally, Smith reported having pain in the left hip, for which he had received an injection of Cortisone, as well as low back pain. Smith had been involved in a boat accident resulting in an injury to his back. Upon examination, Dr. Po noted that Smith was 6'2" tall, and weighed 238 lbs. Dr. Po noted no spasm in the hip area. (Tr. 116.) Smith had a high riding left patella with skin discoloration and thickening over the patella tendon and tibial area from constant kneeling. The doctor noted slight weakness in the anterior cruciate and medial collateral ligament. (Tr. 116.) Dr. Po reviewed x-rays taken at the VA on April 26, 2001. The doctor noted that the pelvis was negative for fracture, dislocation, and arthritis. (Tr. 116.) The 2001 X-rays of the right knee revealed a calcified area of the patella, and narrowing of the lateral joint. Based on the 2001 x-rays, Dr. Po diagnosed left knee chronic bursitis tibial tubercule and patella tendinitis and bilateral patella alta and suspect avulsion of patella tendon. (Tr. 116.) Dr. Po gave Smith a work excuse for an indefinite period of time, noting that Smith "has been a welder all his life and that is the only occupation he knows." (Tr. 116.) No pain

medication was prescribed, but Dr. Po instructed Smith to avoid kneeling, squatting, climbing, and crawling activities. Dr. Po also opined that an MRI of the left knee would be helpful in determining the extent of the soft tissue of the patella tendon. (Tr. 117.)

A radiology report from September 24, 2002, indicated that the ischial spine on the left was "quite prominent with heterotopic bone formation noted." Right sacroiliac joint showed degenerative changes. An abnormal ischial spine was diagnosed and it was recommended that Smith have a CT of the pelvis with axial images at bone windows for further evaluation. (Tr. 147.)

An April 2003 MRI of the lumbar spine showed spinal canal stenosis. Thick, blocky anteriorly pointed posterior bony facets were noted on the entire lumbosacral spine. (Tr. 166.) There were early signs of disc dehydration, the worst being at L5-S1. Disc dessication was noted at L4-5, L3-4, and L5-S1, and an annular tear was suggested at L5-S1. (Tr. 166.) Intervertebral disc disease was associated with bony osteophytes. Along with posterior bone hypertrophy and thickened ligaments, narrowing at the intervertebral disc levels was noted. (Tr. 166.) Effacing of the ventral theca fluid and peripheral neural theca fluid was noted at L5-S1. The ventral fat and fluid around the nerve root were effaced or thinned if not completely absent in the region of the ventral theca sac. (Tr. 166.) Changes at L4-L5 were similar to

those at L5-S1, except with more effacement. The changes at L3-L4 were similar, with less effacement of fluid and fat. Less severe changes were noted at L2-L3. (Tr. 167.) The changes noted were consistent with mild to moderate spinal stenosis and indicated a possible annular tear. (Tr. 167.)

On August 18, 2003, Smith was treated for epigastric pain. The records indicate that Smith takes high doses of NSAIDS (nonsteroidal anti-inflammatory drugs) and is narcotic dependent. (Tr. 172.) In May 2003, Smith was treated with Keflex for hyperpigmented pruritic lesions.

A Compensation and Pension Exam Report based on an evaluation by Dr. Po, noted right knee deformity secondary to patella tendon avulsion with associated quadricep weakness, limited motion, and painful joint; patella alta, left knee with associated chronic pre-tibial tendon; and degenerative disc disease lumbar spin L5-S1 with annular tear and associated with sacroiliac joint irregularity bilaterally. (Tr. 209.) The report reflects abnormal walking, directly related to the knee problem and resulting in overuse of the lumbar spine.

Smith was evaluated by Dr. David Steiner on September 8, 2003. (Tr. 199.) Upon observation, Smith had an altered gait, tenderness at the bottom of the spine, tenderness in hips over trochanters, marked right quadricep atrophy, and decreased sensation of right index and middle fingers with absence of the tips of ring and

9

little fingers. (Tr. 199.) Dr. Steiner found x-rays of the lumbar spine to be "very normal" with no arthritic changes and good preservation of the disc spaces. (Tr. 200.) X-rays of the right knee revealed patella alta and calcification distal to the pole of the patella, and a marginal osteophyte on the lateral aspect of the femur of the joint line. Dr. Steiner found that Smith was limited to doing only sedentary work because of his right knee and hand injuries and a very significant sensor lag. (Tr. 200.)

<u>Law and Analysis</u>

<u>Issue No. 1</u>:    Whether the ALJ erred in concluding that Smith did not equal the listing of impairments contained in Appendix 1, Subpart P, Regulation No. 4, Listing 1.02 and 1.03.

First, Smith argues that the ALJ erred in finding that Smith did not equal the impairment listings 1.02 and 1.03. Smith cites the text of former listing 1.02, which, until February 2002, provided a listing for active rheumatoid arthritis. In February, 2002, the criteria for rheumatoid arthritis was removed form Listing 1.02, and a new listing, 14.09 was created in the Immune System Listing. The Social Security Administration reasoned that rheumatoid arthritis is a connective tissue disorder that should be grouped with other connective tissue disorders. Thus, Listing 14.09 covers all inflammatory arthritis conditions, including rheumatoid arthritis. <u>See</u> 66 Fed. Reg. 58010 (November 19, 2001); Appendix 1, Subpart P, Regulation No. 4, Listing 14.09.

Here, the ALJ evaluated Smith's arthritis under "new" listing

10

1.01, et. seq., and not listing 14.09.[5]  The SSA has noted that

*Inflammatory arthritis.* Documented as described in 14.00B6 (includes a vast array of disorders that differ in cause, course, and outcome. For example, inflammatory spondyloarthropathies include ankylosing spondylitis, Reiter's syndrome and other reactive arthropathies, psoriatic arthropathy, Behçet's disease, and Whipple's disease, as well as undifferentiated spondylitis. Inflammatory arthritis of peripheral joints likewise comprises many disorders, including rheumatoid arthritis, Sjögren's syndrome, psoriatic arthritis, crystal deposition disorders, and Lyme disease. Clinically, inflammation of major joints may be the dominant problem causing difficulties with ambulation or fine and gross movements, or the arthritis may involve other joints or cause less restriction of ambulation or other movements but be complicated by extra-articular features that cumulatively result in serious functional deficit. When persistent deformity without ongoing inflammation is the dominant feature of the impairment, it should be evaluated under 1.02, or, if there has been surgical reconstruction, 1.03) with one of the following:

1. A. History of joint pain, swelling, and tenderness, and signs on current physical examination of joint inflammation or deformity in two or more major joints resulting in inability to ambulate effectively or inability to perform fine and gross movements effectively, as defined in 14.00B6b and 1.00B2b and B2c; or

B. Ankylosing spondylitis or other spondyloarthropathy, with diagnosis established by findings of unilateral or bilateral sacroiliitis (e.g., erosions or fusions), shown by appropriate medically acceptable imaging, with both:

> 1. History of back pain, tenderness, and stiffness, and

> 2. Findings on physical examination of ankylosis (fixation) of the dorsolumbar or cervical spine at 45° or more of flexion measured from the vertical position (zero degrees);

or

C. An impairment as described under the criteria in 14.02A.
or

D. Inflammatory arthritis, with signs of peripheral joint inflammation on current examination, but with lesser joint involvement than in A and lesser extra-articular features than in C, and:

> 1. Significant, documented constitutional symptoms and signs (e.g., fatigue, fever, malaise, weight loss), and

individuals with inflammatory arthritis that do not meet the requirements of listing 14.09 are to be evaluated under listing 1.02 or any other body system listing that is appropriate. See 66 Fed. Reg. 58010 (November 19, 2001). Apparently that is what the ALJ did in this case.

The ALJ determined that Smith did not meet the requirements of 1.01, et. seq., because he did not have any of the following: an inability to ambulate effectively, involvement of both upper extremities, nerve root compression or atrophy with sensory or reflex loss, positive straight-leg test results, amputation of both hands or one hand and one lower extremity, or a hemipelvectomy or hip disarticulation. (Tr. 16.)

A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1. Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 891-92, 107 L. Ed. 2d 967 (1990). See also, Selders v. Sullivan, 914 F. 2d 614, 619 (5th Cir. 1990). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment

---

2. Involvement of two or more organs/body systems (see 14.00B6d). At least one of the organs/body systems must be involved to at least a moderate level of severity.

or

E. Inflammatory spondylitis or other inflammatory spondyloarthropathies, with lesser deformity than in B and lesser extra-articular features than in C, with signs of unilateral or bilateral sacroiliitis on appropriate medically acceptable imaging; and with the extra-articular features described in 14.09D.

12

that manifests only some of those criteria, no matter how severe, does not qualify." Sullivan v. Zebley, 110 S. Ct. at 891. Smith argues that he met *former* listing 1.02, but fails to address current listings 1.02 or 14.09, effective February 19, 2002.[6] Smith has failed to meet his burden of proving that his condition meets or equals an impairment listed in Appendix 1, and I find that there is substantial evidence in the record to support the Commissioner's decision that Smith did not meet or medically equal any of the listed impairments. See Sullivan v. Zebley, 493 U.S. 521 (1990); Selders v. Sullivan, 914 F.2d 614, 619 (5th Cir. 1990); Lastrape v. Barnhart, 2005 U.S. Dist. LEXIS 11357 (EDTX March 24, 2005).

Issue No. 2: Whether the ALJ erred in failing to find that Smith's skin condition was a severe impairment in combination with Smith's other severe impairment, and in failing to address the skin condition under listing 8.02 and/or 8.05.

Next, Smith argues that the ALJ erred in failing to find that his skin condition was a severe impairment in combination with Smith's other impairments. Listing 8.02 reads: "Exfoliative dermatitis, ichthyosis, ichthyosiform erythroderma. With extensive lesions not responding to prescribed treatment," and Listing 8.05 reads: "Psoriasis, atopic dermatitis, dyshidrosis. With extensive lesions, including involvement of the hands or feet which impose a

---

[6]Smith filed his application for DIB on August 15, 2002, after the new listings were effective.

13

marked limitation of function and which are not responding to prescribed treatment." Appendix 1, Subpart P of Part 404. Skin lesions may result in a marked, long-lasting impairment if they involve extensive body areas or critical areas such as the hands or feet and become resistant to treatment. Appendix 1, Subpart P, Part 404, Listing 8.00A.

Smith claims that his itching started when he was working in Honduras. While Smith stated that he was concerned that he had contracted some disease in Honduras, a punch biopsy of his rash revealed that Smith had lichen simplex chronicus (Tr. 124), which is a skin disorder characterized by chronic itching and scratching[7]. **www.medlineplus.gov.** Additionally, Smith did not claim in his disability report that his skin condition limited his ability to work. (Tr. 63.) Dr. Po did not mentioned a rash or

---

[7]Lichen simplex chronicus is a skin disorder characterized by a self-perpetuating scratch-itch cycle. It may begin with something that rubs, irritates, or scratches the skin, such as clothing, which causes the person to rub or scratch the affected area. Constant scratching causes the skin to thicken. The thickened skin itches, causing more scratching, causing more thickening. The skin may become leathery and brownish in the affected area. This disorder may be associated with atopic dermatitis (eczema) or psoriasis. It may also be associated with nervousness, anxiety, depression, and other psychologic disorders.

The primary treatment is to stop scratching the skin. This may include counseling to become aware of the importance of not scratching, stress management, or behavior modification. The itching and inflammation may be treated with a lotion or steroid cream applied to the affected area of the skin. www.medlineplus.gov

lesions upon physical examination, despite mentioning even non work-related diagnoses (obesity and nicotine addiction). (Tr. 116.) Dr. Steiner did not note a rash or lesions upon physical examination, either. (Tr. 200.)

Records from June 2001 indicated that the rash started as a pimple and expanded to about 3-4 cm, and it responds to topical antifungal cream. (Tr. 125.) Doctor's notes from April 2002 indicate that a small rash appeared over most of Smith's body. Smith claimed the rash was not responding to medication. (Tr. 129.) The next complaints from Smith regarding his rash was August 2002. (Tr. 145.) Upon examination, it was noted that Smith had scattered pustules with some lesions. (Tr. 145.) It was suspected that Smith had psoriasis or tinea corporis (fungal infection; ringworm). (Tr. 145.) www.medlineplus.gov. Smith was prescribed Dovonex[8] ointment to be used in the morning, and Lidex[9] cream to be used in the evening. (Tr. 146.) In April and May 2003, Smith was prescribed Keflex (used to treat infections caused by bacteria - medlineplus.gov) and Cordran tape (used to treat itching, redness, dryness, crusting, scaling, inflammation and discomfort of various skin conditions - medlineplus.gov). (Tr. 184.) It was noted that

---

[8]Used to treat psoriasis.

[9]Used to treat itching, redness, dryness, crusting, scaling, inflammation, and discomfort of various skin conditions.

Smith rated his pain as "0" on a scale of 1 to 10. (Tr. 184.)

Smith testified that he would not be able to prepare food when he had rash outbreaks on his hands. (Tr. 232.) He stated that the rashes "drive you nuts" at night. (Tr. 230.) Smith refers to his rash as a skin disease that he caught in Honduras. There are no medical records indicating that Smith's lichen simplex chronicus either caused Smith pain or limited his ability to work. Nor do the records indicate that Smith suffered from exfoliative dermatitis, ichthyosis, or ichthyosiform erythroderma, with extensive lesions not responding to treatment (listing 8.02). Smith has also failed to show that he suffered from psoriasis with *extensive* lesions involving the hands or feet that impose a *marked limitation of function* and are not responding to treatment (listing 8.05). A "marked limitation" is one that is more than moderate but less than extreme. Additionally, Smith testified that the rash would "clear up" after two to three months of treatment. (Tr. 233.)

As noted above, a claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1. Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 891-92, 107 L. Ed. 2d 967 (1990). See also, Selders v. Sullivan, 914 F. 2d 614, 619 (5th Cir. 1990). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those

16

criteria, no matter how severe, does not qualify." Sullivan v.
Zebley, 110 S. Ct. at 891. Here, I find that there is substantial
evidence to support the commissioner's decision that Smith's skin
disorder did not meet or medically equal a listing, even when
considered in combination with Smith's other recognized
impairments.

Issue No. 3:    Whether the ALJ erred by giving more weight to the
                opinion of the evaluating physician rather than the
                treating physician.

Finally, Smith very briefly states that the ALJ improperly
accorded more weight to the opinion of the evaluating physician
rather than the treating physician. In the one paragraph that
Smith submits regarding this issue, he states that Drs. Cenac, Po,
and Steiner are orthopedic surgeons, and that other medical records
support the opinions and conclusions of Dr. Po. (Doc. #8, p.17.)
Apparently, Smith is arguing that the ALJ erred in according
limited weight to the opinion of Dr. Po. However, the court notes
that the ALJ accorded limited weight to only one specific opinion
of Dr. Po on the ultimate issue of disability. Specifically, the
ALJ did not accord great weight to Dr. Po's conclusion that Smith
was "disabled."

Opinions on ultimate issues, such as disability status under
the regulations, are reserved exclusively to the ALJ. See 20 C.F.R.
§§ 404.1527(e)(1), 416.927(e)(1). Opinions on the ultimate issue

of disability, such as statements by medical sources to the effect that a claimant is "disabled," are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements. Id.

The ALJ specifically noted Dr. Po's opinion that Smith is disabled, but gave the opinion little weight, especially considering the context of Dr. Po's statement. Dr. Po stated that Smith was unable to perform any work, but also stated that the only work Smith knew was welding. (Tr. 17.) Thus, Dr. Po's disability finding seemed to be more focused on the fact that Smith could not return to his past work as a welder, rather than his inability to return to any work whatsoever. (Tr. 117.) It is evident from the decision that the ALJ considered all of the medical records before issuing a decision regarding Smith's claim.

However, at Step 5, the burden shifts to the ALJ to prove that other work exists in significant numbers in the national economy that the claimant can perform. See 20 C.F.R. § 404.1520(f). The ALJ should rely primarily on the Dictionary of Occupational Titles ("DOT") for information about the requirements of work in the national economy. See SSR 00-4p. Here, when the ALJ asked the VE whether there were any jobs that a claimant with Smith's residual functional capacity could perform, the VE cited no occupations from the Dictionary of Occupational Titles. Rather, the VE stated that Smith could work in the category of census code D376,

"investigators and adjusters, except insurance." (Tr. 249.) The VE testified that there are 48,000 of these jobs nationwide. (Tr. 249.) The VE further stated that this investigator/adjustor position is a sedentary job. (Tr. 249, 250.) The VE also testified that a claimant with Smith's RFC could work as a driver, such as an escort truck driver, under "census code 804." (Tr. 250.)

The occupation of investigator/adjustor, except insurance, is listed as Occupation D376 in the Occupational Classification System Manual, **www.bls.gov/ncs/ocs/ocsm/comD376.htm**, providing that the position:

> "Includes clerical workers who investigate backgrounds of persons or businesses who are applying for credit or employment, investigate customer complaints and prepare reports for customers or subscribers. Also include occupations involving adjusting customer complaints about unsatisfactory service, damaged or incorrect merchandise, or incorrect billing of accounts."

Occupation G804 in the Occupational Classification System Manual is that of truck driver, providing:

> "Drive trucks of all capacities to transport materials in liquid or packaged form and personnel to and from specified destinations. May position blocks and tie rope around items to secure cargo during transit. May verify load against shipping papers. Also include special service equipment truck drivers such as Tow-truck Operators, Garbage Truck Drivers, Concrete Mixer Drivers." **www.bls.gov/ncs/ocs/ocsm/comG804.htm.**

While the census codes do not provide much guidance as to the exertional requirement for a truck driver, the Dictionary of

19

Occupational Titles provides numerous "driver" listings. For example, one that closely matches the census listing cited by the VE provides as follows:

> 906.683.022 Truck Driver Light (any industry)
>
> Drives truck with capacity under 3 tons to transport materials in liquid or packaged form and personnel to and from specified destinations, such as railroad stations, plants, residences, offices, or within industrial yards: Verifies load against shipping papers. Drives truck to destination, applying knowledge of commercial driving regulations and roads in area. Prepares receipts for load picked up. Collects payment for goods delivered and for delivery charges. May maintain truck log according to state and federal regulations. May maintain telephone or radio contact with supervisor to receive delivery instructions. May drive truck equipped with public address system through city streets to broadcast announcements over system for advertising or publicity purposes. May load and unload truck. May inspect truck equipment and supplies, such as tires, lights, brakes, gas, oil, and water. May perform emergency roadside repairs, such as changing tires, installing light bulbs, fuses, tire chains, and spark plugs. May be known in establishment according to type of activity as Crew-Truck Driver (any industry); Insect Sprayer, Mobile Unit (government ser.); Mail-Truck Driver (any industry); Motor-Vehicle-Escort Driver (business ser.); Pick-Up Driver (motor trans.); Service-Parts Driver (automotive ser.); Sprinkler-Truck Driver (any industry).

This DOT listing is somewhat more restrictive than the census listing as it provides for a truck with capacity of under 3 tons; the census listing provides for a truck of *any* capacity. The DOT provides that the "truck driver light" position has a medium exertional level. The VE testified that the census code truck driver position was a light exertional level. The Fifth Circuit has found that where there is a conflict between the VE's testimony and the DOT, the ALJ may rely upon the VE's testimony, provided

that the record reflects an adequate basis for doing so. See Carey v. Apfel, 230 F.3d 131, 146 (5th Cir. 2000). However, the undersigned finds there is not substantial evidence in the record to support the finding that Smith could work as a truck driver. The ALJ specifically found that Smith had "limited lower push/pull because of injuries to his knees and some degenerative arthritis or joint problems in his back." (Tr. 249.) The medical records indicate that Smith has extensive knee problems with muscle atrophy in both legs, and Smith testified that he is only able to drive his car two to three times a week. (Tr. 220.)

As for the position of "investigator/adjuster, except insurance," the most closely related occupation in the DOT is occupation 241.367-014, Consumer Complaint Clerk (alternate title, Adjustment Clerk), which provides:

> Investigates customer complaints about merchandise, service, billing, or credit rating: Examines records, such as bills, computer printouts, microfilm, meter readings, bills of lading, and related documents and correspondence, and converses or corresponds with customer and other company personnel, such as billing, credit, sales, service, or shipping, to obtain facts regarding customer complaint. Examines pertinent information to determine accuracy of customer complaint and to determine responsibility for errors. Notifies customer and designated personnel of findings, adjustments, and recommendations, such as exchange of merchandise, refund of money, credit of customer's account, or adjustment of customer's bill. May recommend to management improvements in product, packaging, shipping methods, service, or billing methods and procedures to prevent future complaints of similar nature. May examine merchandise to determine accuracy of complaint. May follow up on recommended adjustments to ensure customer satisfaction. May key information into computer to obtain computerized records. May trace missing merchandise and be designated Tracer Clerk

21

(clerical). May investigate overdue and damaged shipments or shortages in shipments for common carrier and be designated Over-Short-And-Damage Clerk (clerical). May be designated according to type of complaint adjusted as Bill Adjuster (clerical); Merchandise-Adjustment Clerk (retail trade); Service Investigator (utilities; tel. & tel.).

The DOT position, like that cited by the VE, is a sedentary position, which involves sitting most of the time, but may involve standing or walking for brief periods of time. (Dictionary of Occupational Titles, Appendix C.)

When asked whether the hypothetical claimant could sit/stand every half hour for comfort because of pain in his back and knees while working as an investigator/adjustor, except insurance, the VE testified "I don't think it would hurt the adjustor jobs." (Tr. 250.) However, the VE also testified that if the hypothetical claimant had a limited ability to write because of the dominant hand injury ("his fourth and fifth fingers have been amputated about a third of the way down and the two remaining fingers, the second and third finger have nerve damage...." (Tr. 249)), then he could not perform the requirements of "investigator/adjustor, except insurance," and he is unemployable. (Tr. 250.) Based on the forgoing, the record is not clear as to whether Smith could perform the job of investigator/adjuster, except insurance.[10]

---

[10]Although the record reflects that Plaintiff completed the twelfth grade, there is no other evidence as to Plaintiff's reading, writing, or analytical skills required by the DOT definition.

The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts. See Brock v. Chater, 84 F.3d 726, 728 (5th Cir. 1996) (citations omitted). The Court will not reverse the decision of an ALJ for failure to fully and fairly develop the record unless the claimant shows that he or she was prejudiced by the ALJ's failure. See Carey v. Apfel, 230 F.3d 131 (5th Cir. 2000), citing Brock, 84 F.3d at 728; Kane v. Heckler, 731 F.2d 1216, 1220 (5th Cir. 1984). To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result. Id.

Here, the reasons for the ALJ's determination that Smith could perform the jobs of truck driver or "adjustor/investigator, except insurance" are not articulated. The VE simply stated that Smith could perform those jobs, without discussing the requirements of either position or how Smith's limitations affected his abilities to perform the required tasks. The ALJ should have elicited testimony from the VE regarding the specific requirements of the census positions and whether Smith's push/pull limitations, hand injury, limited writing and driving ability, limited ability to get into and out of cars, skin disorder, and other limitations, would affect the ability to perform the functions of those job classifications.

At the fifth step of the five-step analysis to determine

23

whether a claimant is able to engage in any "substantial gainful activity" under 42 U.S.C.S. § 423(d)(1)(A), the burden is on the Commissioner to show that the claimant can perform relevant work. See Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001). Based on the foregoing discussion, the undersigned finds that the Commissioner failed to meet his burden. There is insufficient evidence in the record, especially considering the medical records and the VE's testimony, to conclude that Smith can perform relevant work.

The undersigned finds it necessary that the case be remanded for a more thorough vocational assessment to determine whether Smith can perform the specific occupational requirements for the jobs listed by the VE, considering the DOT job classifications, and given Smith's physical limitations and RFC as determined by the ALJ.

### Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the case be REMANDED to the Commissioner for further proceedings consistent with this opinion.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a

copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 5th day of July, 2005.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE